IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MICHAEL DANIEL CROYLE, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>THEATINE FATHERS, INC., et al.,<br><br>Defendants. | CIVIL NO. 19-00421 JAO-WRP<br><br>**ORDER DENYING THEATINE FATHERS' MOTION TO DISMISS AND GRANTING ARCHDIOCESE FOR THE MILITARY SERVICES, USA'S MOTION TO DISMISS** |

**ORDER DENYING THEATINE FATHERS' MOTION TO DISMISS AND GRANTING ARCHDIOCESE FOR THE MILITARY SERVICES, USA'S MOTION TO DISMISS**

Plaintiffs Michael Croyle ("Michael"), his legal guardian and mother Sandra Croyle ("Sandra"), and his father David Croyle ("David") bring claims against Defendants Theatine Fathers, Inc. and The Theatine Fathers Province of Our Lady of Purity (collectively, the "Theatines"), as well as Defendant Archdiocese for the Military Services, USA ("AMS") based on a Theatine priest's sexual assaults on Michael at Tripler Army Medical Center in the 1990s. The Theatines move to dismiss Plaintiffs' claims as untimely, ECF No. 30, and AMS moves to dismiss because the Court lacks jurisdiction over it as a nonresident defendant, ECF No.

29.  For the reasons stated below, the Theatines' motion is DENIED and AMS's motion is GRANTED.

## I.    BACKGROUND

### A.    Facts

As alleged in the amended complaint, in the late 1990s, when Michael was about eight years old, he lived in Hawai'i with his parents while his father was stationed at Tripler Army Medical Center ("Tripler").  ECF No. 7 ("FAC") ¶¶ 13, 16.  Michael and his family attended church services at the Catholic chapel at Tripler, where Father Mark Matson ("Fr. Matson") led mass.  *Id.* ¶ 14.

Fr. Matson was a member of the Theatine Fathers Province of Our Lady of Purity, a Catholic religious order based in Colorado and operated by The Theatine Fathers, Inc.  *Id.* ¶¶ 4-5.  The Theatines ordained Fr. Matson in 1976 and served as his employer, giving Fr. Matson his clerical assignments.  *Id.* ¶ 5.  In 1993, the Theatines allowed Fr. Matson to apply to be a contract priest at Tripler through the Department of Defense.  ECF No. 29-2 ("Foster Decl.") ¶¶ 17-18.[1]  Thus, in the 1990s, Fr. Matson served in Hawai'i as the Catholic chaplain at Tripler pursuant to a contract between the Army and the Theatines.  *Id.* ¶ 10.  As part of that

---

[1]  Where, as here, facts are relevant to the personal jurisdiction analysis, the Court will look beyond the allegations in the FAC to the evidence the parties submitted. *See Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002). For purposes of the Theatines' motion under Rule 12(b)(6), however, the Court considers and accepts as true only those factual allegations contained in the FAC.

agreement, the Army required an endorsement that Fr. Matson was a Catholic priest. *Id.* ¶ 11. AMS provides these endorsements so that Catholic priests can serve as military chaplains, and provided the endorsement for Fr. Matson here for the agreement between the Army and the Theatines.[2] *Id.* ¶¶ 6-7, 11-12.

Prior to his service at Tripler, Fr. Matson had a history of sexual abuse such that Plaintiffs allege the Theatines and AMS knew or should have known of the risk of harm to children in close proximity to Fr. Matson. *See id.* ¶¶ 26-27. Plaintiffs allege Fr. Matson sexually abused a minor seminary student while he was the rector at a seminary in Colorado in the 1970s, sexually abused other minor boys in Colorado in the 1980s, and was acquitted on charges for sexually assaulting a minor in California in the late 1980s. *See id.* ¶ 26.

Fr. Matson then abused Michael in Hawai'i in the 1990s. *Id.* ¶¶ 15-19, 22. Michael attended religious education classes after mass, but on at least six occasions, when Fr. Matson appeared to escort Michael out of the chapel to attend

---

[2] AMS was established to provide Catholic ministry to the United States Armed Forces. Foster Decl. ¶ 2. Because the military can neither ordain individuals nor certify that they are authorized to perform religious acts, it relies on religious organizations like AMS to verify that individuals are authorized to provide religious services. *Id.* ¶ 10. AMS provides such endorsements on behalf of the Catholic Church. *Id.* ¶ 11. When AMS endorses a particular priest, that priest does not become a member of AMS, but instead remains subject to his own diocese's bishop or (as here) his order's superiors. *Id.* ¶¶ 3, 15, 21; *see also* ECF No. 41-1 ("Doyle Decl.") ¶ 6. AMS never becomes a party to nor involved in the negotiations of any military contract—only the priest or his superiors do. Doyle Decl. ¶ 5; Foster Decl. ¶ 13.

the classes, he instead diverted Michael to a room to sexually assault him.  *Id.* ¶¶ 15-16.  Fr. Matson abused Michael both in the chapel and other rooms at Tripler, by performing oral sex on Michael while masturbating, sodomizing Michael, and forcing Michael to touch his penis and perform oral sex on him.  *Id.* ¶ 16-19, 22.  Fr. Matson threatened that Michael would go to hell if he told anyone about these assaults and also told Michael that the assaults were normal and that Michael's parents knew about and approved of the assaults.  *Id.* ¶¶ 20, 23.

Michael has suffered from severe mental health injuries and conditions since the sexual abuse and, as a result of the abuse, was adjudged to be an incapacitated and disabled person.  *Id.* ¶¶ 24-25, 32.  His mother, Sandra, was appointed as his guardian and conservator and has incurred substantial costs relating to Michael's psychiatric care and treatment.  *Id.* ¶¶ 25, 32.

In June 1998, Fr. Matson was terminated from his position at Tripler for theft.  *Id.* ¶ 28.  Shortly after, in August 1998, police arrested Fr. Matson for sexually assaulting a minor boy in a park in Hawaiʻi and, in 2000, he was convicted of third-degree sexual assault and first-degree attempted assault.  *Id.* ¶ 29-31.  In August 1998, AMS withdrew its endorsement of Fr. Matson to serve as a Catholic chaplain.  *Id.* ¶ 30.  The FAC is silent as to when Michael remembered the abuse or informed Sandra of the abuse.

**B.     Procedural History**

Plaintiffs filed a Complaint against Defendants on August 6, 2019.  ECF No. 1.  After the Court issued an order to show cause regarding insufficient allegations of subject matter jurisdiction, ECF No. 6, Plaintiffs filed the FAC on August 23, 2019, ECF No. 9.  In the FAC, Michael brings a gross negligence claim against the Theatines and AMS (Counts I & II).  FAC ¶¶ 34-62.  All three Plaintiffs bring a claim for intentional infliction of emotional distress ("IIED") against the Theatines and AMS (Count III).  *Id.*  ¶¶ 63-66.  Sandra and David also bring a negligent infliction of emotional distress ("NIED") claim against both the Theatines and AMS (Count IV).  *Id.* ¶¶ 67-73.

AMS moved to dismiss the FAC, arguing the Court lacks personal jurisdiction over AMS.  ECF No. 29.  The Theatines moved to dismiss all claims as untimely.  ECF No. 30.  Plaintiffs oppose these motions.  ECF Nos. 39-41.[3]  The Court held a hearing on Defendants' motions on December 13, 2019.  ECF No. 47.

---

[3] Plaintiffs filed two oppositions to AMS's motion to dismiss.  ECF Nos. 40-41. At the hearing on the motion, Plaintiffs' counsel conceded that only ECF No. 41 need be considered.

## II.    DISCUSSION

The Court concludes that (1) Plaintiffs' claims cannot be dismissed as untimely at this juncture, but that (2) it lacks personal jurisdiction over AMS.[4]

### A.    The Theatines' Motion to Dismiss under Rule 12(b)(6)

#### 1.    Legal Standard under Rule 12(b)(6)

Rule 12(b)(6) allows an attack on the pleadings for failure to state a claim on which relief can be granted. "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted). However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 557) (citation omitted). A complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. This means that the complaint must plead "factual content that allows the court to draw

---

[4] The parties failed to file a statement regarding a pre-filing conference as required under the local rules. *See* L.R. 7.8. Going forward, the parties are instructed to comply with all local rules; a failure to do so may result in the denial of future motions or other sanctions.

the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

Relevant here, a claim may be dismissed at this stage on the basis that it is untimely. However, "[a] claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations only when 'the running of the statute is apparent on the face of the complaint.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (citation omitted). In fact, "[a] complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Id.* (quoting *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995)).

## 2. Plaintiffs' Claims Cannot Be Dismissed as Untimely under 12(b)(6)

The Court denies the Theatines' motion because it does not appear beyond a doubt that Plaintiffs can prove no set of facts that would establish the timeliness of their claims. While the parties agree that Hawaiʻi Revised Statutes ("HRS") § 657-1.8 ("Section 657-1.8") is applicable here, they disagree about how it applies and whether Plaintiffs' claims are timely under it. Because the parties offer different interpretations of the statute, the Court notes that, under Hawaiʻi law, statutory interpretation requires the following steps:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, [a court's] sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is [a court's] foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

*Hawaii State Teachers Ass'n v. Abercrombie*, 126 Hawai'i 318, 320, 271 P.3d 613, 615 (2012), *as amended* (Jan. 27, 2012) (citation omitted). With that in mind, the Court turns to examine Section 657-1.8.

Effective April 24, 2012, Section 657-1.8 extended the statute of limitations for damages actions premised on childhood sexual abuse.[5] Relevant here, it

---

[5] Prior to that date, actions for damage to persons had to be instituted within two years after the cause of action accrued, except as provided in HRS § 657-13. *See* HRS § 657-7. Section 657-13, in turn, provides that individuals who are injured when they are minors may bring such claims within two years of reaching eighteen. *See* HRS § 657-13. The same statute of limitations applies to claims for IIED and NIED. *See DeRosa v. Ass'n of Apartment Owners of the Golf Villas*, 185 F. Supp. 3d 1247, 1260 (D. Haw. 2016), *as amended* (Aug. 31, 2016). Although the Theatines' briefing confusingly refers to a *2011* version of Section 657-1.8, *see* ECF No. 46 at 2 n.1, the Theatines' counsel conceded at the hearing that Section 657-7 applied to claims like those brought here before the legislature enacted Section 657-1.8 in 2012.

currently provides:[6]

> (a) Notwithstanding any law to the contrary, except as provided under subsection (b), no action for recovery of damages based on physical, psychological, or other injury or condition suffered by a minor arising from the sexual abuse of the minor by any person shall be commenced *against the person* who committed the act of sexual abuse more than:
>
>> (1) Eight years after the eighteenth birthday of the minor or the person who committed the act of sexual abuse attains the age of majority, whichever occurs later; or
>>
>> (2) Three years after the date the minor discovers or reasonably should have discovered that psychological injury or illness occurring after the minor's eighteenth birthday was caused by the sexual abuse,
>
> whichever comes later.
>
> . . . .
>
> (b) For a period of eight years after April 24, 2012, a victim of child sexual abuse that occurred in this State may file a claim in a circuit court of this State *against the person* who committed the act of sexual abuse if the victim is barred from filing a claim against the victim's abuser due to the expiration of the applicable civil statute of limitations that was in effect prior to April 24, 2012.
>
> A claim may also be brought under this subsection against a legal entity if:

---

[6] Section 657-1.8 has evolved since 2012 to provide increasing timeframes within which plaintiffs may bring claims. *See* 2012 Haw. Sess. Laws Act 68 (two-year window); 2014 Haw. Sess. Laws Act 112 (four-year window); 2018 Haw. Sess. Laws Act 98 (eight-year window). The most recent amendment made clear that the changes applied retroactively to the date of enactment. *See* 2018 Haw. Sess. Laws Act 98.

> (1) The person who committed the act of sexual abuse against the victim was employed by an institution, agency, firm, business, corporation, or other public or private legal entity that owed a duty of care to the victim; or
>
> (2) The person who committed the act of sexual abuse and the victim were engaged in an activity over which the legal entity had a degree of responsibility or control.
>
> Damages against the legal entity shall be awarded under this subsection only if there is a finding of gross negligence on the part of the legal entity.

HRS § 657-1.8 (emphasis added). The Theatines argue that Plaintiffs' claims are untimely under subsection (a), and thus that Plaintiffs cannot rely on the longer window under subsection (b).

More specifically, the Theatines point to allegations from a different case Michael brought in a Missouri federal court in 2016 against the United States regarding the same sexual abuse. *See* ECF No. 30 at 4 (citing ECF No. 30-1 ("Missouri Compl.") ¶¶ 23-26). In the Missouri Complaint, Michael alleged he failed to have a present memory of the abuse until 2012 when he first disclosed Fr. Matson's abuse to Sandra, and that neither discovered the connection between his injuries and the sexual abuse until 2012. Missouri Compl. ¶¶ 23-25. According to the Theatines, these allegations demonstrate that any claims against them accrued in 2012, and are now untimely under Section 657-1.8(a) because they expired at the latest eight years after Michael's eighteenth birthday (in 2016). The Theatines argue that because Plaintiffs' claims are untimely under subsection (a), they are not

eligible to benefit from the longer window set forth under subsection (b). These arguments are flawed for a few reasons.

i.      **The Missouri Allegations Are Not Judicial Admissions or Subject to Judicial Notice**

First, the Theatines' arguments rely on the Court either taking judicial notice of the allegations in the Missouri Complaint or, alternatively, treating those allegations as judicial admissions in this case. The Theatines fail to show that either doctrine applies here.

Taking the latter first, the Ninth Circuit has rejected the notion that allegations in one case may be deemed binding judicial admissions in a separate case on the same subject matter. *See Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208, 1213 (9th Cir. 2016) (rejecting plaintiff's argument that the defendant was bound by its allegations in a related state court action regarding the validity of a contract because the doctrine of binding judicial admissions "is inapplicable because the alleged admission was made in a separate case from the present action" (citations omitted)); *see also Nextdoor.com, Inc. v. Abhyanker*, No. C-12-5667 EMC, 2013 WL 3802526, at *8 (N.D. Cal. July 19, 2013) ("While an admission in a prior lawsuit may be admissible *evidence* in a later proceeding, it is not a binding *admission*, and thus does not control a motion to dismiss." (citation omitted)). The Theatines fail to cite binding authority to the contrary that would permit the Court to treat allegations from the Missouri

Complaint as binding admissions here on a 12(b)(6) motion.[7]  The Court therefore declines to do so.

The Theatines' argument regarding judicial notice also falls short.  A court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).[8]  A court may thus take judicial notice of matters of public record, but not the truth of facts within those records that are subject to reasonable dispute.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).  Here, the Court can take judicial notice of the fact that Michael made certain allegations in the Missouri Complaint because that can readily be verified.  *See id.*  However, on a motion to dismiss, the Court may not take judicial notice of the *truth* of these allegations, e.g., when Michael in fact gained a "present memory" of the abuse, particularly for the purpose of establishing an accrual date.  *See id.* at 689-90; *see also Khoja v. Orexigen*

---

[7]  The cases the Theatines cite are inapposite.  *See* ECF No. 30 at 8-9 (citing *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) (holding district court did not abuse its discretion by declining to consider statement in trial brief a binding judicial admission); *Casumpang v. Hawaiian Commercial & Sugar Co.*, 712 F. App'x 709, 710 (9th Cir. 2018) (affirming dismissal of claims as untimely based on allegations in an amended complaint in the same case)).

[8]  If a party provides a court with the necessary information and meets its burden of demonstrating that a fact is properly subject to judicial notice, a court *must* take judicial notice of that fact.  *See* Fed. R. Evid. 201(c)(2).

*Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."); *see also Lauter v. Anoufrieva*, No. CV 07-6811 JVS(JC), 2010 WL 3504745, at *6 n.6 (C.D. Cal. July 14, 2010), *report and recommendation adopted as modified*, 2010 WL 3504732 (C.D. Cal. Aug. 31, 2010) (taking judicial notice of pleadings filed in other actions, but not "the truth of representations made in pleadings which have been judicially noticed").

In *Khoja*, for example, the Ninth Circuit concluded the district court abused its discretion by taking judicial notice of certain facts within an investor call transcript. *See* 899 F.3d at 999-1000. Although there could be no dispute the call occurred and that defendants made certain statements on the call (facts that could be judicially noticed), there could be a reasonable dispute about what that transcript revealed about plaintiffs' knowledge at the time of the call. *See id.* ("It is improper to judicially notice a transcript when the substance of the transcript is subject to varying interpretations, and there is a reasonable dispute as to what the transcript establishes." (citation and alteration omitted)).

So too here where the Theatines ask the Court to take judicial notice of certain allegations for purposes of establishing an accrual date for Plaintiffs' claims. As the Theatines recognize, accrual is based on when a plaintiff *actually*

*discovers*, or through the use of reasonable diligence *should have discovered*, the negligent act, damage, and causal connection between the two. *See* ECF No. 30 at 6-7; *see also Ass'n of Apartment Owners of Newtown Meadows ex rel. Its Bd. of Dirs. v. Venture 15, Inc.*, 115 Hawaiʻi 232, 277, 167 P.3d 225, 270 (2007), *as corrected on denial of reconsideration* (Sept. 20, 2007). Here, there is a reasonable dispute about whether the Missouri Complaint (alleging when Michael obtained a "present memory," first told Sandra about abuse *by Fr. Matson specifically*, and discovered a connection to his injuries) conclusively establishes 2012 as an accrual date for the claims alleged here. For example, the allegations in the Missouri Complaint leave open to interpretation what "present memory" means, whether Michael disclosed prior abuse to Sandra *more generally*, and when the Plaintiffs discovered the Theatines' tortious acts (as compared to their priest's abuse). There is also no explicit allegation that Michael and Sandra could not have discovered the abuse before 2012 through the use of reasonable diligence.[9] The

---

[9] This leaves open the potential for Plaintiffs to prove an accrual date earlier than 2012 based on facts relevant to the "should have known" standard. The Theatines point to an allegation that Michael and Sandra had no reason to know of the *United States' negligence* before 2012. *See* ECF No. 30 at 4 (citing Missouri Compl. ¶ 26). But at this stage, that allegation does not necessarily establish beyond dispute when they could have discovered *Fr. Matson's* abuse or the *Theatines'* tortious conduct. And, in any event, knowledge of *negligence* is not determinative for accrual. *See Ass'n of Apartment Owners of Newtown Meadows*, 115 Hawaiʻi at 277, 167 P.3d at 270 ("A plaintiff need only have factual knowledge of the

14

Court therefore declines to take judicial notice of the truth of any allegations in the Missouri Complaint for the purpose of establishing an accrual date.[10]  The Theatines' motion, which relies on the Court deeming certain facts admitted or taking judicial notice of the truth of certain facts, must therefore be denied.  *See* ECF No. 30 at 2-3.

### ii. A Discovery Date of 2012 Does Not Necessarily Render Plaintiffs' Claims Untimely

Yet, even if the Court were to accept as true that, in 2012, Plaintiffs first discovered Fr. Matson's abuse, the Theatines still have not shown Plaintiffs' claims are subject to dismissal as untimely under Rule 12(b)(6).

Even if the Court accepted as true that Plaintiffs both discovered the abuse and resulting injury in 2012 and could not reasonably have discovered their claims before then, the Theatines still have not shown the claims are barred at this stage under Section 657-1.8(a) because they have not shown beyond dispute that subsection (a) even applies.  The plain language of subsection (a) applies to claims "against the person who committed the act of sexual abuse," and none of Plaintiffs

---

elements necessary for an actionable claim; legal knowledge of a defendant's negligence is not required.").

[10]  To be clear, the Court has determined only that, because the allegations are subject to reasonable dispute (and particularly so for the purpose of establishing an accrual date), dismissal at this stage on the basis of judicial notice is unwarranted. The Court does not yet affirmatively determine the accrual date.

claims here are against that person. And, as discussed above, the allegations leave open the potential for Plaintiffs to prove their claims accrued and expired before the statute of limitations was amended in April 2012 under the "should have known" standard, and thus are now revived under subsection (b).

Even putting that aside, the allegations in the Missouri Complaint do not indicate *when* in 2012 Plaintiffs' claims allegedly accrued. For example, if Plaintiffs' claims accrued in *January* 2012, then Section 657-1.8(a) was not yet in effect. The Theatines cite no binding authority indicating that, if Plaintiffs' claims accrued in January 2012, then Section 657-1.8(a) would apply to their claims. *Cf. Yamaguchi v. Queen's Med. Ctr.*, 65 Haw. 84, 89-90, 648 P.2d 689, 693-94 (1982) (holding that an amendment to a statute of limitation applied prospectively only, relying "upon the well-established rule of construction forbidding the retrospective operation of statutes in the absence of clearly expressed contrary legislative intent," and that the limitations period in effect at the time of accrual applies and begins to run at that time (citations omitted)). The state legislature did not indicate that Section 657-1.8(a) applied retroactively when it first enacted it. *See* 2012 Haw. Sess. Laws Act 68 ("SECTION 3. This Act shall take effect upon its approval.").[11] Nor did the Theatines provide any argument or evidence to support

---

[11] In comparison, when the state legislature amended Section 657-1.8, it made clear that such changes did apply retroactively—but only until April 24, 2012. *See*

this proposition.[12]

The Theatines also seem to argue that Plaintiffs' claims could still be time barred because they are ineligible under subsection (b) if their claims under the previous statute of limitations had not *expired* when subsection (b) went into effect on April 24, 2012. *See* ECF No. 30 at 14. But that is contrary to the plain language of the statute that conditions subsection (b) only on the victim being barred "from filing a claim against the victim's abuser due to the expiration of the applicable civil statute of limitations that was in effect prior to April 24, 2012." If barred under the prior limitations period at the time this action was filed in 2019,

---

2018 Haw. Sess. Laws Act 98 ("SECTION 3. This Act shall take effect on July 1, 2018, and shall apply retroactively to April 24, 2012.").

[12] When the Court raised this issue at the hearing, the Theatines' counsel cited *Doe v. Roe*, 67 Haw. 63, 677 P.2d 468 (1984). In *Doe*, the legislature amended the statute of limitations for a paternity suit *after* the plaintiff's claim expired, and the Hawaiʻi Supreme Court concluded the legislature intended to revive previously expired claims based on the text and history of that amendment. The Court is not persuaded at this stage that citation to *Doe* alone demonstrates that subsection (a) applies to claims that accrued prior to its enactment in April 2012. *Compare* ECF No. 48 (Theatines' non-binding supplemental authority), *with, e.g.*, *Lynch v. Fed. Nat'l Mortg. Ass'n*, CIVIL NO. 16-00213 DKW-KSC, 2016 WL 6776283, at *7 n.4 (D. Haw. Nov. 15, 2016) ("Courts have held that Congress did not clearly manifest an intent for the longer limitations period enacted in July 2010 to apply retroactively, and, therefore, the two-year limitations period applies to claims that accrued before July 2010." (citation omitted)).

then, Plaintiffs can rely on subsection (b).[13]  For these reasons, the Theatines have

failed to demonstrate beyond a doubt that Plaintiffs' claims are untimely.

### iii.        Eligibility to Bring Claims under Section 657-1.8(b)

The Court also rejects the Theatines' request to dismiss Sandra and David's

claims under the theory that only Michael can benefit from subsection (b).

The Court is not persuaded that a difference in wording across subsections

(a) and (b) demonstrates that the parents of a minor victim may benefit from

subsection (a), but not subsection (b).  *See* ECF No. 30 at 13.  The Theatines

misquote subsection (a) in contrasting it to subsection (b).  *See id.*  Still, if

subsection (a) covers a parent's claims for IIED and NIED, the Theatines do not

explain why the state legislature would provide a significant limitations period for

a parent's claims under subsection (a), but not allow those claims to be revived

under subsection (b)—particularly given that a minor's reluctance to come forward

impacts his or her parents' ability to bring derivative claims for the harm the

perpetrator's abuse caused them.  Indeed, other provisions of Section 657-1.8

indicate that the claims covered by the two sections are coextensive.  *See* HRS §

657-1.8(d) (requiring certificate of merit to be filed in action brought under either

---

[13]  The Court rejects the Theatines' argument that this interpretation of subsection (b) renders subsection (a) superfluous.  ECF No. 30 at 12; ECF No. 46 at 3. Because the Theatines' motion fails to demonstrate beyond a doubt that Plaintiffs' claims are governed by and untimely under subsection (a), the Court need not decide whether such claims could be revived under subsection (b).

subsection (a) or (b) stating the facts and opinions relied on to conclude there is a reasonable basis to believe "that the plaintiff was subject to one or more acts that would result in an injury or condition *specified in [subsection] (a)*" (emphasis added)).

The Theatines point to a portion of subsection (b) that permits only a "victim of child sexual abuse" to bring a claim against the perpetrator if that "victim" would otherwise be barred from filing a claim against the "victim's abuser." ECF No. 46 at 11. But that portion is inapplicable here given Plaintiffs sued the Theatines and AMS—not the abuser, Fr. Matson. In the portion of subsection (b) that does apply here for claims against *entities*, there are no similar limitations. *See* HRS § 657-1.8(b).[14]

A court in this District has contrasted these portions of subsection (b) to conclude that the statute provides for more expansive liability against entities, i.e., that a claim against an entity may proceed even if it could not have proceeded against the abuser himself. *See Wagner v. Church*, 208 F. Supp. 3d 1138, 1142-43 (D. Haw. 2016). In *Wagner*, the plaintiff sued a church alleging a pastor sexually abused him while on a service trip *in Texas*. *See id.* The church moved to dismiss

---

[14] "A claim may also be brought under this subsection against a legal entity if" the entity employed the perpetrator or owed a duty of care to the victim, or the entity had a degree of responsibility or control over the activity the perpetrator and victim were engaged in when the sexual abuse occurred. HRS § 657-1.8(b).

based on language in subsection (b) indicating it applied only if the sexual abuse occurred *in Hawaiʻi.* *See id.* The *Wagner* court denied the motion, concluding that, although claims against the abuser under subsection (b) are limited to acts that occurred in Hawaiʻi, "[t]he plain language of the statute . . . does not contain a geographical qualifier on claims against the employing or supervisory entities." *Id.* at 1142-43. So too here, where the plain language does not contain a qualifier that claims against employing or supervisory entities must be brought by the minor victim who was sexually abused.

The *Wagner* court explained that this plain reading permitting broader claims against entities also "comports with the purpose of the statute and the intent of the state legislature," to hold entities responsible for placing a child in a position where he or she may be abused. *Id.* at 1143. ("The lack of a geographical limitation on claims against entities represents a public policy decision to place a broad burden on organizations to ensure that they vet individuals who come into contact with children, and to ensure that children are adequately supervised and protected from acts of sexual abuse." (citation omitted)). Particularly relevant here, *Wagner* noted that Hawaiʻi has recognized that organizations that place adults in positions of trust and in close proximity to children bear an expansive legal burden to protect children under their custody and care—relying on a case where the Hawaiʻi Supreme Court recognized that this burden is for the benefit of

the child *and his parents* because, if breached, both the child *and his parents* are harmed. *See id.* at 1143 (citing *Doe Parents No. 1 v. State*, 100 Hawaiʻi 34, 70, 58 P.3d 545, 579-93 (2002), *as amended* (Dec. 2 and 5, 2002)).[15]

In light of the plain language of subsection (b) reflecting a decision to provide for more expansive liability against entities and the recognition that this policy serves to ensure that entities protect children for their own benefit and that of their parents, the Court declines to conclude at this juncture that the Theatines have demonstrated that Michael and Sandra's claims are untimely as a matter of law.[16]

For all of these reasons, the Theatines' motion is **DENIED.**

---

[15]  In *Doe Parents No. 1*, the reinstatement of a teacher accused of child molestation "without first ascertaining that it is, at the very least, more likely than not that he or she is actually innocent of the accusation, certainly . . . renders it 'particularly foreseeable' . . . that the teacher may molest one of his or her students." 100 Haw. at 70, 58 P.3d at 581 (citation omitted). In other words, "Put simply, where such circumstances are present, and the teacher in fact molests a student while the child is in attendance at school, we believe it self-evident that the child's resulting psychological trauma, *as well as that of the child's parents*, 'involve[s] circumstances [that] guarantee [its] genuineness and seriousness[.]'" *Id.* (emphasis added) (citation omitted).

[16]  And even if the language was unclear, the state legislature enacted Section 657–1.8(b) to "provide victims of sexual abuse a fair chance" to pursue claims against perpetrators and entities. S. Stand. Comm. Rep. No. 2473 (Mar. 1, 2012); *see* H. Stand. Comm. Rep. No. 1574–12 (Apr. 5, 2012) (same).

**B.  AMS's Motion to Dismiss under Rule 12(b)(2)**

AMS moves separately to dismiss the FAC under Rule 12(b)(2) on the basis that the Court lacks jurisdiction over it as a nonresident defendant.

### 1.  Legal Standard under Rule 12(b)(2)

A plaintiff bears the burden of establishing personal jurisdiction over a nonresident defendant.  *See Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 608 (9th Cir. 2010); *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).  The plaintiff must establish personal jurisdiction over the defendant with respect to each claim.  *See Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004).  Where, as here, a district court acts on a motion to dismiss without holding an evidentiary hearing, a plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss.  *See Love*, 611 F.3d at 608; *Schwarzenegger*, 374 F.3d at 800.  Although a plaintiff may not simply rest on the bare allegations of the complaint, uncontroverted allegations in the complaint must be taken as true, and conflicts between parties over statements contained in affidavits or declarations—such as those between the declarations each side submitted here—must be resolved in the plaintiff's favor.  *See Love*, 611 F.3d at 608; *Schwarzenegger*, 374 F.3d at 800.

A district court considers two factors before exercising personal jurisdiction over a nonresident defendant in a diversity of citizenship case: (1) whether an

applicable state rule or statute potentially confers jurisdiction over the defendant; and (2) whether assertion of such jurisdiction accords with constitutional principles of due process. *See Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1392 (9th Cir. 1984). "[T]he jurisdictional inquiries under state law and federal due process merge into one analysis" where, as here, the state's long-arm statute is "coextensive with federal due process requirements."[17] *Roth v. Garcia Marquez*, 942 F.2d 617, 620 (9th Cir. 1991) (citation omitted).

The Due Process Clause protects a person's "liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)) (footnote omitted). The Due Process Clause requires that defendants have "certain minimum contacts with [Hawaiʻi] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316 (citation omitted); *Data Disc, Inc. v. Systems Tech. Assocs., Inc.*, 557 F.2d 1280, 1287 (9th Cir. 1977).

---

[17] *See Cowan v. First Ins. Co. of Haw.*, 61 Haw. 644, 649, 608 P.2d 394, 399 (1980) (stating that Hawaii's long-arm statute, HRS § 634-35, was adopted to expand the jurisdiction of Hawaiʻi courts to the extent permitted by the due process clause of the Fourteenth Amendment).

In applying Due Process Clause requirements, courts have created two jurisdictional concepts: general and specific jurisdiction. Plaintiffs argue only that the Court has specific jurisdiction over AMS. Specific jurisdiction over a defendant exists when the cause of action arises out of that defendant's contact or activities in the forum state. *See Roth v. Garcia Marquez*, 942 F.2d 617, 620 (9th Cir. 1991).

## 2.     Assessing Specific Jurisdiction

The Ninth Circuit applies the following three-part test to determine whether specific jurisdiction exists:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802 (citation omitted). The plaintiff bears the burden of satisfying the first two prongs of the test. *See id.* If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is lacking. If the plaintiff succeeds in satisfying the first two prongs, the burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable. *See id.*

With regard to the first prong of the specific jurisdiction test, the Ninth

Circuit generally looks to a party's "purposeful direction" for actions sounding in tort, and "purposeful availment" for actions sounding in contract. *See id.* at 802-03. Plaintiffs bring only tort claims against AMS, so the "purposeful direction" test applies here. In evaluating purposeful direction, the Ninth Circuit uses a three-part "effects" test derived from *Calder v. Jones*, 465 U.S. 783 (1984).[18] *See Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). "[T]he 'effects' test requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* (citations omitted).

More recently, the Supreme Court clarified that in assessing personal jurisdiction, a court must "look[ ] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v.*

---

[18]  The Ninth Circuit has not always spoken with precision when addressing which test to apply to tort claims. Sometimes the Ninth Circuit has stated that the "purposeful direction" test applies to tort claims generally, *see Schwarzenegger*, 374 F.3d at 802, while other times it has indicated that test applies only to *intentional* tort claims, *see Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 460 (9th Cir. 2007). Because Plaintiffs bring claims for IED, NIED, and gross negligence and no contract-based claims, though, the Court concludes their "cause of action arises primarily in tort; therefore, *Calder*'s 'effect's test' is the proper framework for the first prong's purposeful availment and direction analysis." *Menken v. Emm*, 503 F.3d 1050, 1059 (9th Cir. 2007) (applying purposeful direction test to negligence claim brought alongside intentional tort claims); *compare Holland Am. Line*, 485 F.3d at 460 (concluding *Calder* effect's test did not apply to "breach of contract and negligence claims" (citations omitted)).

*Fiore*, 571 U.S. 277, 285 (2014) (citations omitted). Thus, a "mere injury to a forum resident is not a sufficient connection to the forum." *Id.* at 290. Rather, "an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." *Id.* "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State" and that "relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State" rather than "persons who reside there." *Id.* at 284-85 (citation omitted). Following *Walden*, the Ninth Circuit has confirmed that merely alleging that a defendant engaged in wrongful conduct targeting a plaintiff the defendant knows to be a resident of the forum state, such that harm in the forum state is foreseeable, is insufficient on its own to support the exercise of jurisdiction. *See Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069-70 (9th Cir. 2017).

### 3. Assessing Specific Jurisdiction over AMS

The Court concludes that, under the foregoing standards, Plaintiffs have not met their burden of demonstrating purposeful direction and thus showing that the Court can exercise jurisdiction over AMS. Plaintiffs base jurisdiction here solely on AMS's endorsement of Fr. Matson, which is sufficient to demonstrate that AMS committed an intentional act. *See Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015) (noting first prong of effects test requires only that defendant acted with

intent to perform an actual, physical act in the real world).  Plaintiffs fail to meet their burden under the second prong of the effects test, however, because they have failed to demonstrate that AMS's suit-related conduct, i.e., this endorsement, creates a substantial connection to Hawaiʻi.

Even if Plaintiffs have demonstrated:  that AMS's endorsement amounted to a certification that Fr. Matson could perform sacraments *and* met the moral and spiritual criteria expected of priests, that AMS's endorsement was a necessary precondition to his placement in Hawaiʻi, and that AMS knew its endorsement was ultimately for a placement in Hawaiʻi, this is insufficient to demonstrate purposeful direction.  *See* Doyle Decl. ¶¶ 11-12, 18.  AMS is a Maryland corporation that operates out of Washington, D.C.  Foster Decl. ¶¶ 4-5.  AMS's allegedly tortious conduct consists of sending (from D.C.) an endorsement form and letter to the Army (in D.C.) that enabled the Theatines (a Colorado entity) to enter a contract with the Army—and then eventually withdrawing its endorsement by sending another letter to the Army (in Virginia).  Foster Decl. ¶¶ 4-9, 16-20; ECF No. 29-3; ECF No. 29-4; ECF No. 29-5; ECF No. 41-2 at 4; FAC ¶ 4.  While the contract between the Army and the Theatines involved the Army's military contracting center in Hawaiʻi and entailed performance by the Theatines in Hawaiʻi (through Fr. Matson's chaplain services), all of *AMS's* suit-related conduct occurred without *AMS* entering Hawaiʻi, contacting any person in Hawaiʻi, or otherwise reaching out

to Hawaiʻi. *See id.*; *see also Picot*, 780 F.3d at 1215 (concluding no jurisdiction over defendant in California where defendant's tortious interference consisted of "making statements to . . . an Ohio resident . . . that caused . . . a Delaware corporation with offices in Ohio . . . to cease making payments into two trusts (in Wyoming and Australia)" all "without entering California, contacting any person in California, or otherwise reaching out to California" despite plaintiff being a resident of California and defendant having twice traveled to California in connection with the parties' own business relationship).

There can be no dispute these forms made clear that the purpose of the endorsement was to enable Fr. Matson to serve in Hawaiʻi. *See* ECF No. 29-3; ECF No. 29-4 ("THIS ENDORSEMENT IS FOR SERVICE AT TRIPLER ARMY MEDICAL CENTER HAWAII"). But while AMS's endorsement (and later withdrawal) was limited to Tripler in Hawaiʻi, Plaintiffs offer no evidence or allegations that AMS took that forum into account when considering and making the endorsement or that AMS had any control over the forum for which the endorsement was requested. *See Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 606 (9th Cir. 2018) (concluding jurisdiction existed over a defendant who voluntarily entered the forum state and committed a tort there; distinguishing *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136 (9th Cir. 2017) where jurisdiction was lacking because the defendants were not in the forum state of

Arizona of their own volition—but instead because they filed suit against plaintiffs in Nevada and then had to serve process, seek subpoenas, and engage in other litigation conduct in Arizona where plaintiffs resided). Indeed, even if AMS ultimately provided the endorsement, Fr. Matson remained subject to his superiors within the Theatines.[19] Foster Decl. ¶¶ 3, 18; FAC ¶ 5. At most, then, AMS's contacts with Hawaiʻi—based on *Fr. Matson's* decision to seek an assignment and the *Theatines'* request for an endorsement to execute a contract with the *Army*, Foster Decl. ¶¶ 17-18—are the type of random, fortuitous, and attenuated contacts that do not suffice to subject AMS to jurisdiction. *See Axiom Foods*, 874 F.3d at 1068; *see also Walden*, 571 U.S. at 286 ("Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." (citation omitted)).

Plaintiffs emphasize that Fr. Matson could not have served in Hawaiʻi without AMS's endorsement, that AMS could foresee that endorsing a priest with a history of sexual abuse could cause harm in Hawaiʻi, and that AMS had the power to withhold that endorsement to avoid that risk of harm. ECF No. 41 at 9-11; Doyle Decl. ¶¶ 11-12, 18. But the Court must focus on AMS's contacts with

---

[19] Nor does Plaintiffs' conclusory allegation that AMS was the Theatines' agent suffice to establish jurisdiction. *See Williams v. Yamaha*, 851 F.3d 1015, 1024-25 & n.5 (9th Cir. 2017); FAC ¶ 60.

Hawaiʻi—not its contacts with persons like Plaintiffs or Fr. Matson who may have resided in Hawaiʻi. *See Axiom Foods*, 874 F.3d at 1070 (affirming that California lacked jurisdiction despite defendant distributing newsletter that infringed California plaintiff's copyrights, including to plaintiff's potential customers, partners, and suppliers—a handful of whom were physically located in California and 55 of whom had companies in California, including 14 that had locations in California—because this was too attenuated and isolated to support jurisdiction).

Further, as discussed above, foreseeability that Fr. Matson would enter the forum and cause injury in the forum is not a sufficient benchmark for assessing specific jurisdiction. *See id.*; *Williams*, 851 F.3d at 1023 n.3 (distinguishing between a defendant who knows products will be sold and used in forum state and benefits from those sales, and a defendant who actively directs advertising and sales efforts of in-state agent such that specific jurisdiction exists); *see also Multistar Indus. v. Ocala*, NO. 2:19-CV-0182-TOR, 2019 WL 4017245, at *7 (E.D. Wash. Aug. 26, 2019) ("Even if [defendants made false statements about the status of a vehicle warranty and] knew the vehicle belonged to a Washington company and was destined for Washington, this is not sufficient to establish personal jurisdiction over [defendants] in Washington."). To the extent Plaintiffs allege AMS's tortious acts include a *failure* to take certain action, e.g., failing to investigate Fr. Matson from outside Hawaiʻi, *see, e.g.*, FAC ¶¶ 52-54, 56, 59, these

allegations fail to demonstrate the type of significant connection to the forum state necessary to establish jurisdiction.

Nor do the cases Plaintiffs cite otherwise persuade the Court that they have carried their burden. Those cases both predate *Walden* and involve scenarios where, unlike here, defendants deliberately initiated contact with the forum state. *See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1131 (9th Cir. 2003) (affirming jurisdiction over defendant in California where defendant "purposefully sought out a business relationship with a California corporation, had ongoing contacts with the state over a five-year period, and drafted an agreement which called for performance, and was consummated in, California"); *D. Brutke's Victory Hills, LLC v. Tutera*, No. 3:12-cv-01951-SI, 2013 WL 3818146, at *7-9 (D. Or. July 22, 2013) (finding minimum contacts under purposeful availment test where defendant sought out substantial, ongoing contractual relationship with and owed fiduciary duties to plaintiff LLCs that were incorporated and conducting business in forum state); *Day v. Harrah's Hotel & Casino Las Vegas*, No. 10cv1746-WQH-JMA, 2010 WL 4568686, at *5 (S.D. Cal. Nov. 2, 2010) (finding minimum contacts where defendant solicited business in forum state including by targeting forum residents); *Geanacopulos v. Narconon Fresh Start*, 39 F. Supp. 3d 1127, 1132 (D. Nev. 2014) (same).

Jurisdiction in those cases was proper because "the contacts proximately

result[ed] from actions by the defendant *himself* that create[d] a 'substantial connection' with the forum State." *Burger King*, 471 U.S. at 475 (citations and footnote omitted). But where, as here, the defendant's connection to the forum is based on the unilateral decisions of another party, jurisdiction is lacking. *See id.* at 475 n.17 (citing *Kulko v. Superior Court of Cal.*, 436 U.S. 84, 93-94 (1978) (concluding California lacked jurisdiction over father-defendant in child support action even though father allowed child to reside with mother-plaintiff in California for longer than set forth in custody agreement and mother then brought claim for full custody and increased child support)).

Because Plaintiffs have not established the second prong of the purposeful direction test, the Court concludes it cannot exercise jurisdiction over AMS and need not address the other factors. *See Picot*, 780 F.3d at 1215 n.4.[20] The Court also rejects Plaintiffs' request for jurisdictional discovery because it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for

---

[20] For completeness, the Court would reach the same conclusion under the purposeful availment test. *See Picot*, 780 F.3d at 1212; *see also Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155-56 (9th Cir. 2006) ("Evidence of availment is typically action taking place in the forum that invokes the benefits and protections of the laws in the forum." (emphasis added) (citation omitted)). The contractual negotiations at issue here are between the Army and the Theatines—with AMS serving a peripheral role. That other parties might perform in Hawaiʻi under their agreement does not mean that jurisdiction over AMS in Hawaiʻi is somehow proper. *See Picot*, 780 F.3d at 1213 ("[T]he fact that a contract envisions one party discharging his obligations in the forum state cannot, standing alone, justify the exercise of jurisdiction over another party to the contract.").

jurisdiction. *See Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014). AMS's motion is therefore **GRANTED.**

## III. CONCLUSION

For the foregoing reasons, the Court **DENIES** the Theatines' motion to dismiss under Rule 12(b)(6) and **GRANTS** AMS's motion to dismiss under Rule 12(b)(2).

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, December 30, 2019.

Jill A. Otake
United States District Judge

Civil No. 19-00421 JAO-WRP, *Croyle, et al. v. Theatine Fathers, Inc., et al.*, ORDER DENYING THEATINE FATHERS' MOTION TO DISMISS AND GRANTING ARCHDIOCESE FOR THE MILITARY SERVICES, USA'S MOTION TO DISMISS

33